**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

LEPRINO FOODS COMPANY,

      Plaintiff,

      -vs-

UNITED HEALTHCARE SERVICES, INC.,

      Defendant.

Civil Action No:

COMPLAINT FOR –

(1) BREACH OF FIDUCIARY DUTY UNDER ERISA;
(2) BREACH OF CONTRACT

DEMAND FOR JURY TRIAL

---

## COMPLAINT

---

Plaintiff Leprino Foods Company ("Leprino") through its undersigned counsel, submits this complaint against United Healthcare Services, Inc. ("United"), and alleges as follows:

### PRELIMINARY STATEMENT

1. Leprino Foods Company ("Leprino") contracted with United to administer Leprino's self-funded Health and Welfare Plan ("Leprino Plan") for Leprino employees and their family members ("Plan Participants"). United repeatedly breached its fiduciary duties and the terms of its contract with Leprino by failing to properly review and adjudicate claims for the Leprino Plan, misleading Leprino about the nature of losses to the Leprino Plan, and misleading Leprino about subsequent law enforcement investigations and recovery efforts, thereby impeding Leprino's own efforts to recover funds wrongfully paid out from the Leprino Plan.

2.      United served as the intermediary between Leprino and the health care providers that treat and care for Plan Participants. In exchange for sizable compensation, United reviewed claims submitted by those providers to evaluate whether they were legitimate.

3.      From 2015 through 2023, United handled claims for medical services for Plan Participants. During that time, United improperly caused the Leprino Plan to incur more than $2.3 million in provider claims that never should have been paid by United. Since then, United has caused Leprino to expend substantial legal fees and costs pursuing recoupment from those providers that United improperly paid. Those legal expenses are growing as that pursuit continues to this day.

4.      United functioned as both a named and functional fiduciary under the federal Employee Retirement Insurance Security Act of 1974, as amended ("ERISA"). As such, United owes ERISA-imposed fiduciary duties of prudence and loyalty to Leprino, the Leprino Plan, its members, and beneficiaries. United materially and repeatedly breached those duties. United recklessly and/or with gross negligence paid claims for fraudulent services. United then engaged in fraud and/or concealment to prevent and interfere with Leprino's efforts to investigate and understand the resulting losses to the Leprino Plan. United also prevented and interfered with Leprino's efforts to recover funds wrongfully paid for fraudulent procedures when United would not do so itself.

5.      Leprino brings this action on its own behalf, and as a fiduciary on behalf of the Leprino Plan, to address the damages that United's wrongful conduct caused to Leprino and the Leprino Plan.

## PARTIES

6.      Leprino is a family-owned company with its principal place of business in Denver, Colorado. Leprino is a dairy industry pioneer that is highly respected as a manufacturer of global dairy ingredients. Leprino sponsors a group health plan governed by ERISA. The Leprino Plan is considered "self-funded," also known as "self-insured," because the employer retains the financial risk of paying for health care claims. The Leprino Plan covers Leprino employees residing in the states of Colorado, California, New Mexico, and elsewhere.

7.      United is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. On information and belief, United is the largest health plan in the country, and number five in terms of overall company size on the Fortune 500 list.

## JURISDICTION AND VENUE

8.      Pursuant to 29 U.S.C. § 1132(e), 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367, this Court has jurisdiction over the claims asserted in this Complaint.

9.      The Court has subject matter jurisdiction over the claims asserted in this Complaint. Leprino's breach of fiduciary duty claims against United arise under ERISA, 29 U.S.C. § 1001, *et seq.* The Court therefore has original jurisdiction over those claims. 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over Leprino's breach of contract claims against United. 28 U.S.C. § 1367.

10.      The Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, as there is diversity-of-citizenship jurisdiction and the amount in controversy exceeds $75,000.00. Diversity of citizenship exists as Leprino is a Colorado corporation with its

principal place of business in Denver, Colorado. United is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.

11.     The Court has personal jurisdiction over United because, at all times relevant to the claims asserted herein, United has conducted business in the State of Colorado within the meaning of Colorado's Long-Arm Statute, C.R.S. § 13-1-124(1)(a). United's contacts with the State include, but are not limited to:

- United has been registered in Colorado and has done business in Colorado through its affiliate UnitedHealthcare of Colorado, Inc. since at least 1986;

- United has multiple offices in this State and within the District;

- United has contractual relationships with hundreds, if not thousands, of doctors, hospitals, and other healthcare providers that care for and treat patients in the State and in this District, ranging in size from large hospital systems to single doctor practices;

- United provides medical insurance coverage to thousands of families and individuals who reside in this State and in this District;

- United has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in this State and in this District; and

-  United has administered the Leprino Plan for Leprino employees and their families in this State and in this District.

12.     By agreeing to contract, adjudicate, and to transmit payment for medical treatment of Leprino employees, and beneficiaries residing in Colorado, United has purposefully availed itself of the privilege of conducting business within Colorado.

13.     United has previously been sued in this District and did not object to jurisdiction or venue.

14.     For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).

## LEGAL BACKGROUND

15.     Under ERISA, any person or entity that exercises any discretionary authority or discretionary control respecting management of an ERISA plan or exercises any authority or control respecting management or disposition of a plan's assets is a fiduciary. 29 U.S.C. § 1002(21)(A). An individual "may acquire fiduciary status" either by (a) being expressly appointed by the plan as a fiduciary, or (b) by "exercis[ing] the fiduciary functions set forth in ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)." *Holdeman v. Devine*, 474 F.3d 770, 777 (10th Cir. 2007).

16.     "ERISA imposes higher-than-marketplace quality standards on insurers." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). The fiduciary duties of an ERISA fiduciary have been called the "highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (*quoting Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

17.     The ERISA duty of loyalty under § 404(a)(1)(A), *see* 29 U.S.C § 1104(a)(1)(A), requires ERISA fiduciaries to manage and administer an ERISA plan solely in the interest of the plan's participants and beneficiaries for the exclusive purpose of providing benefits to participants

and their beneficiaries and defraying reasonable expenses of the funds. This duty of loyalty encompasses several obligations, including the duty to avoid giving misleading or inaccurate information. *See Ruessler v. Boilermaker-Blacksmith Nat'l Pension Tr. Bd. Of Trustees*, 64 F.4th 951, 961 (8th Cir. 2023) ("One way a fiduciary can breach the duty of loyalty is by making an affirmative and materially misleading statement.").

18.     This fiduciary duty also brings with it the obligation to "inform when the trustee knows that silence might be harmful," *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999) (quoting *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993)); *see also Ruessler*, 64 F.4th at 961 (stating that the duty of loyalty requires "prohibiting affirmative misrepresentations" and may include "disclos[ing] any material information that could adversely affect a participant's interests"); *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1025 (8th Cir. 2022) (noting that "the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests"). Likewise, "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1)." *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983).

19.     The ERISA duty of prudence under § 404(a)(1)(B), requires fiduciaries to manage and administer plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C § 1104(a)(1)(B). This means "[a] fiduciary has a duty to protect the plan's assets against spurious claims" and "[i]t must

consider the interests of deserving beneficiaries as it would its own." *Gaither v. Aetna Life Ins.*
*Co.*, 394 F.3d 792, 807–08 (10th Cir. 2004).

20.    ERISA fiduciaries may not contract around their fiduciary duties or around liability
for breaches of those duties. ERISA law states that "any provision in an agreement or instrument
which purports to relieve a fiduciary from responsibility or liability for any responsibility,
obligation, or duty under this part shall be void as against public policy." 29 U.S.C § 1110(a).

21.    Any fiduciary who "breaches any of the responsibilities, obligations, or duties
imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan
any losses to the plan resulting from each such breach, and to restore to such plan any profits of
such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall
be subject to such other equitable or remedial relief as the court may deem appropriate...." 29
U.S.C. § 1109(a).

22.    A participant, beneficiary, or fiduciary may file suit against an ERISA fiduciary to
enforce 29 U.S.C. § 1109(a) and recover the losses to the plan resulting from the fiduciary's
breach. 29 U.S.C. § 1132(a)(2). A party may be entitled to reasonable attorney's fees and costs for
pursuing such an action. 29 U.S.C. § 1132(g)(1).

## FACTUAL BACKGROUND

### A.    Leprino Hired United to Provide Third Party Administrative Services for the Leprino Plan

23.    In 2015, Leprino and United entered into an Administrative Services Agreement
("ASA"), attached hereto as Exhibit 1, wherein United agreed, among other things, to provide
"Claims Determination and Appeals" services to Leprino. ASA at p. 12. This would include "(i)
performing initial benefit determinations and payment, and (ii) performing the fair and impartial

review of first level internal appeals and (iii) performing the fair and impartial review of second level internal appeals." *Id.* The ASA explicitly identifies United as a fiduciary regarding these services. *Id.*

24.    Leprino selected United as one of the Leprino Plan's third-party administrators and fiduciaries because United represented its supposed expertise evaluating claims submitted by providers for adherence to the Leprino Plan's coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services and the American Medical Association.

25.    As a fiduciary, United was delegated the "discretionary authority" to "construe and interpret the terms of the Plan," "determine the validity of charges submitted to United under the Plan" and to "make final, binding determinations concerning the availability of Plan benefits under the Plan's internal appeal process." *Id.* This discretionary authority binds United to the duties of loyalty and prudence required of fiduciaries.

26.    The ASA also stated that United would "provide services related to the detection, prevention, and recovery of abusive and fraudulent claims." *Id.* at p. 10. In order to facilitate United's performance of these services, the ASA "delegated[d] to United the discretion and authority to use such procedures and standards, including the authority to undertake actions," thereby making United a fiduciary regarding United's Fraud and Abuse Management services. *Id.* This obligated United to adhere to the fiduciary duties of loyalty and prudence in its exercise of these services. The ASA also warranted that such Fraud and Abuse Management services would be performed "pursuant to the industry standards for such services." *Id.*

27. The ASA also required United to "provide recovery services for Overpayments." *Id*. at p. 9. To facilitate United's performance of these services, the ASA "delegate[d] to United the discretion and authority to develop and use standards and procedures for any recovery," making United a fiduciary regarding United's recovery obligations. *Id*. at p. 10. This obligated United to adhere to the fiduciary duties of loyalty and prudence in its exercise of these services.

28. United holds itself out to the health plan industry as an active leader in the industry regarding fraud, waste, and abuse management. United trumpets its expertise in handling the enormous challenges and expenses that come with resolving erroneous medical claims through a cohesive alignment strategy to drive performance. United promises to mobilize resources across its entire organization to quickly investigate instances of provider and enrollee fraud, waste, and abuse.

29. United's decision-making authority under the ASA went far beyond mere application and compliance with United's own guidelines. In addition to being a named ERISA fiduciary, United was also a functional fiduciary under ERISA because United exercised discretionary authority and control over management of the Leprino Plan and the disposition of the Leprino Plan's assets.

30. Leprino had no role in United's decision to approve or deny claims. United was uniquely positioned to exercise discretionary authority or control over plan management, including the right to decide whether a claim should be paid and, if so, what to pay for it. Leprino relied on United to process, review, and adjudicate claims for health benefits.

**B.    United Had a Fiduciary Duty to Identify, Deny, and Prevent the Payment of Fraudulent or Improper Claims**

31.    As an ERISA fiduciary, and under the ASA, United had a duty to exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-submitted claims or any claims that did not satisfy the eligibility and other requirements of the Leprino Plan.

32.    As an ERISA fiduciary, and under the ASA, United had a duty to "determine whether a benefit is payable under the Plan's provisions" using "United's claim procedures and standards for Plan's benefit claim determination." ASA at p. 16. This duty required United to employ efforts to combat fraud, waste, and abuse that are at least as stringent as its efforts with its own, fully insured, insurance plans and in a fashion comparable to that of a "prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise" with an eye out for obvious indicia of fraud. 29 U.S.C § 1104(a)(1)(B).

33.    As a fiduciary, and under the ASA, United had a duty to provide Leprino with "information in United's possession" that "relates to United's services under this Agreement" that Leprino needed "in order to administer the Plan." ASA at p. 5. This duty required United to "inform when the trustee knows that silence might be harmful." *See Krohn*, 173 F.3d at 551.

### UNITED'S WRONGFUL CONDUCT

**C.    The Leprino Plan was Billed for Fraudulent and Illegitimate Procedures that United Had a Legal Obligation to Detect**

34.    Since at least 2019, three surgical centers located in Los Angeles County – Avani Outpatient Surgical Center, Inc. ("Avani"), Mountain View Surgical Center, Inc. ("Mountain View"), and The Center for Surgery at Bedford, LLC ("Bedford") (collectively, "the Surgical

Centers") – and a group of surgeons including Dr. Behnam Kashanchi, Dr. Samuel Kashani, Dr. Babak Moeinolmolki, Dr. Shervin Aminpour, Dr. Ralph Mayer, Dr. Michael Yadegari, Dr. Karapet Dermendjian, Dr. Sepehr Lalezari, Dr. Mario Rosenberg, Dr. Daniel Shouhed (collectively "the Surgeons"), Dr. Charles K. Neal, and two recruiters employed by Leprino – Amy Zaragoza and Cristina Perryman – defrauded the Leprino Plan.

35.     These providers defrauded the Leprino Plan by inducing dozens of Leprino employees from Leprino's food processing plants to travel far (in many cases, hundreds of miles) to the Surgical Centers to create false bills. There is evidence that these bills often were (1) for services that were not provided at all or (2) were for non-covered, non-medically necessary, plastic surgeries that were mislabeled as having been other types of medically necessary services. These parties also engaged in the routine and systematic waiver of patient co-payments to induce the patients to come to the Surgical Centers to foster the fraudulent bills.

36.     The patients were further induced by the promise of paid leaves of absence from work under the guise of purportedly necessary medical care, supported by the Surgeons and the Surgical Centers' suspect medical documentation. There is sufficiently transparent evidence that United, if utilizing the "care, skill, prudence, and diligence of a prudent man acting in a like capacity," or the "industry standards" of fraud detection, would have and should have identified and refused to pay the non-covered and false bills.

37.     For example, according to the bills submitted by the Surgical Centers, one of the Leprino Plan patients purportedly underwent five 'medically necessary' surgeries in six months which were likely masked plastic surgeries disguised as, or combined with, medical procedures. These surgeries included (1) an endoscopy in late January 2021, (2) a vaginal/rectal procedure in

early February 2021 (only two weeks later), (3) a colonoscopy in April 2021, (4) a rectal repair / grade 2 hemorrhoid removal in June 2021, and (5) a nasal repair surgery in July 2021 (only two weeks after surgery 4). That one patient would require five invasive and unrelated 'medically necessary' procedures within such a short time frame is highly unlikely. For this one patient, United processed and paid $198,039.40 out of the Leprino Plan's funds. This is just one example of the suspicious billing United did not detect for the Leprino Plan despite United's obligation to do so. There are at least sixty other patients for whom United failed to detect obvious indicia of billing fraud.

38.    Another red flag United should have caught is that Mountain View and Avani not only were located at the same address with the same phone number, but also were both managed by Arti Enterprises, Inc., a company owned by Dr. Parvin Atabay. Atabay has a history of engaging in healthcare fraud and has been prosecuted to a plea agreement at least twice.

39.    The first prosecution against Atabay, in 2007, parallels the recent scheme against Leprino. According to United's own investigation, Atabay's 2007 prosecution involved another surgical center named P&A Surgical Center, which had the same phone number as Mountain View and Avani. In that instance, Atabay paid recruiters to find individuals with health care plans that covered surgical procedures, including colonoscopy, endoscopy, septal reconstruction, hernia repair, and laparoscopy. The recruiters offered members money or discounted cosmetic surgery in exchange for having medically unnecessary surgeries and surgical procedures. Atabay directed recruiters on setting up appointments at P&A Surgical Center or other surgical centers. In some cases, recruiters instructed members to describe false and exaggerated symptoms to create the appearance the surgeries were medically necessary. Doctors at P&A Surgical Center then created

false records to conceal that the procedures were medically unnecessary, and Atabay was alleged to have paid $1,200.00 to $4,500.00 per recruited patient. This activity occurred from 1992 to 2004.

40.    The second federal prosecution against Atabay, in 2020, involved one felony count for the use of an interstate facility (e-mail) in aid of bribery related to the investigation of unlawful referral and kickback payments occurring at Mountain View. Atabay pled guilty to the single felony count. The plea agreement, entered in August 2020, stated Atabay would be excluded from Medicare, Medicaid, and all Federal health care programs.

41.    P&A Surgical Center's CEO, Secretary, CFO, and Agent for Service of Process was Charles Neal. Neal is the current CEO, CFO, Director, and Agent for Service of Process for Mountain View and Avani.

42.    Basic due diligence by United would have spotted that Mountain View and Avani are managed by an individual found guilty of healthcare fraud and are closely affiliated with other outpatient surgical centers that have been entangled in fraudulent healthcare scandals.

43.    Between the suspicious billing patterns and the affiliation with a repeated felon, United should never have paid claims in the first place. But not only did United fail to notice these signs of fraud initially; even after United's Payment Integrity Case Tracking System (United's proprietary fraud detection system) determined in 2021 that 73% of the sampled medical coding was unsupported on its face, United continued to process and pay for additional improper claims.

**D.    United's Belated Investigation Substantiated Allegations of Fraud, but United Failed to React Appropriately**

44.    In 2021, United finally launched an investigation into the Surgical Centers and the Surgeons. This investigation revealed evidence of a fraudulent scheme including:

- Mountain View was the top-billed provider to the Leprino Plan worldwide, even though it provides only outpatient procedures with no overnight stays;

- Mountain View and Avani were managed by an individual who had entered into two separate plea agreements for healthcare fraud;

- United's Payment Integrity Case Tracking System had already reviewed a sample of Mountain View claims and determined that 73% of them were unsupported;

- The top referred diagnosis was diaphragmatic hernia, which is a rare birth defect, unlikely to be present in the adult population;

- Several of the nine (9) physicians referring to Mountain View were billing under multiple Tax Identification Numbers;

- Mountain View, Avani, and Bedford were located approximately 200 miles from Leprino's facility in Lemoore, California, where nearly all the Plan Participants who received services worked (and where employee recruiters Ms. Perryman and Ms. Zaragoza worked);

- There were sixty-six (66) in-network surgery centers within twenty miles of Mountain View and Avani, which would have been much cheaper and more convenient for the Plan Participants, making it suspicious that so many patients would travel the extra distance for more expensive services.

45.    United's investigation substantiated the allegation of misrepresentation of services, as members disclosed that they did not receive the services billed by Mountain View. United's background research also showed that businesses under the same management had been criminally charged for misrepresenting services. Member interviews during the investigation substantiated

that the providers improperly waived copay or member responsibility. Additionally, the providers did not supply documentation to support that any member responsibility payments were collected.

46.     As a result of its investigation, United informed the FBI that "[m]ember interviews established a pattern of UHC members who had a financial responsibility and paid no member responsibility or a reduced amount" and expressed concerns to the FBI that Mountain View was "masking plastic surgery procedures under covered procedures."

47.     United also determined that this scheme led to substantial losses to the Leprino Plan, as well as to other large self-funded plans administered by United (e.g., The Estee Lauder Companies, Inc., T-Mobile, and AT&T).

48.     Despite United's investigation determining that this fraud had occurred, United did not attempt to recoup the payments. Moreover, United continued to make improper payments from the Leprino Plan to the questionable providers for more than a year.

**E.     United Intentionally Misled Leprino About the Fraud Investigation**

49.     Following United's June 2021 investigative findings, United shared some of its high-level findings and an initial report with the FBI. The material shared with the FBI reflected the harm to the Leprino Plan, as well as to other plans that United administered. A few months later, on January 10, 2022, the FBI notified United that the FBI did not have the bandwidth to help with the fraud investigation. The FBI told United that it should <u>not</u> "stop anything you are doing on your end until we are ready to formally open an investigation." The FBI also asked United for United's analysis of the loss to the Leprino Plan and the other plans that had been billed for fraudulent services.

50.     Rather than promptly sharing its loss analysis with the FBI, United allowed six months to lapse without responding to the FBI's request. Moreover, when United did finally follow up with the FBI, on June 8, 2022, United still did not share the loss analysis with the FBI.

51.     On July 11, 2022, the FBI again reported to United that the FBI lacked the resources to support United's investigation of the fraud against the Leprino Plan and the other health plans. When the FBI attempted to schedule a call between United and an Assistant United States Attorney to discuss the fraud further, United allowed another seven months to go by without follow up.

52.     In April 2023, only after Leprino had served United with a subpoena, did United reach back out to the FBI. United only did so to ask the FBI whether the bureau had any objection to United responding to the subpoena, not to assist the FBI in investigating the fraud. The FBI confirmed that the bureau had no objection to the subpoena.

53.     At the same time this chronology was unfolding between United and the FBI, United painted a different picture of the FBI's involvement to Leprino.

54.     On January 19, 2022, Joe Cannizzo, United's Regional Vice President, informed Leprino that United still had not heard back from the FBI about the FBI's investigation. This was nine days after the FBI had told United not to "stop anything you are doing on your end." Leprino did not know at the time that the FBI had been communicating with United about the FBI's lack of bandwidth to investigate and pursue the providers, and that the FBI had been telling United that United should continue to pursue the providers itself. United never corrected this misrepresentation. In fact, United continued to tell Leprino that Leprino should not engage in its own recovery attempts, because to do so would interfere with an active law enforcement investigation.

55.    In January 2022, when Leprino expressed its intent to "partner" with United to pursue the fraudulent providers, United discouraged Leprino from doing so. United stated that sharing _any_ information relating to United's investigation with Leprino "may put at risk the law enforcement engagement," and that the ASA deferred to United the authority to conduct fraud investigations. United's misstatements and concealments induced Leprino to delay its pursuit of the Surgical Centers and the Surgeons.

56.    United also intentionally misled Leprino about United's ongoing payments to these providers. For example, in a high-level timeline of United's investigation provided to Leprino, United alleged that on October 8, 2021, "a hard-deny flag was placed on MV's claims to stop payment." On October 13, 2021, when initially discussing the Surgical Centers' fraud with Leprino, United misrepresented to Leprino that United had implemented a "freeze" on all claims related to the Surgical Centers that would remain in place throughout the course of United's investigation, and that United would be denying all future claim payments to them. Likewise, on November 10, 2021, when Leprino asked United how it intended to deal with the harm to the Leprino Plan, United informed Leprino that United had "turned off payment to [the] provider." In fact, United continued paying many of these providers through October 2022, nearly a year later.

**F.    United Actively Concealed Its Misconduct and Prevented Leprino from Discerning the Extent of The Leprino Plan's Losses**

57.    After Leprino expressed interest in pursuing its own lawsuit to restore the overpayments to the Leprino Plan, United continued to discourage Leprino by overstating the FBI's current involvement in investigating the scheme and suggesting that any action by Leprino might jeopardize such an investigation. Moreover, United refused to disclose to Leprino the communications United had with the FBI, United's investigation documents, or even basic

information about the providers and procedures, arguing that they were United's supposedly "confidential and proprietary" materials. In fact, it was United's duty to pursue this investigation and communicate this fraud for the benefit of the health plans United administered, including the Leprino Plan. United has no legitimate confidential or proprietary interest in the work it is required to perform on behalf of the Leprino Plan or others. There also is no such legitimate interest in an administrator suppressing materials that show the administrator breached its fiduciary and contractual duties, made misrepresentations, or concealed material facts from those to whom it owes fiduciary and contractual duties.

58.     United's actions appear to have been designed to conceal its misconduct and to delay and deny access to the evidence that Leprino needed to pursue the providers directly. United shirked its express contractual obligation and fiduciary duty when it failed to pursue litigation to recoup overpayments, combat fraud, stop payment to these providers, and provide Leprino with information about its findings.

### G.     United Improperly Withheld Information Leprino Needed for Its Investigation

59.     The ASA between United and Leprino requires that, if Leprino "needs information in United's possession for purposes other than an audit, but in order to administer the Plan, United will provide [Leprino] access to that information, if it is legally permissible, the information relates to United's services under this Agreement, and [Leprino] gives United reasonable advance notice and an explanation of the need for such information." ASA at p. 5. Additionally, the ASA allows Leprino to audit United annually to determine whether United was fulfilling the terms of its agreement. *Id*.

60.     Despite these obligations, United delayed and denied access to crucial materials including: a complete and verified spreadsheet of claims billed to United, processed by United, and paid from the Leprino Plan; the explanation of benefits ("EOBs") issued to the patients and provider remittance advice issued to the providers showing how the claims were processed; the Payment Integrity Case Tracking System files showing the lack of support for approximately 70% of the claims; the communications with federal law enforcement; the prepayment and post-payment review flagging records, the stop-payment flagging records of the providers; and United's investigation files and notes into the fraud on the Leprino Plan.

61.     Leprino first requested this information in phone calls with United's Strategic Client Executive, Michelle Birtcher, as early as October 27, 2021. Then, in February and March 2022, Leprino sent several requests for materials to United's Associate General Counsel concerning the Surgical Centers and Ms. Zaragoza, including the transcripts of interviews purportedly conducted by United. Leprino cited the provisions of the ASA which necessitated United's cooperation in Leprino's investigation. Rather than comply with United's contractual and fiduciary obligations and produce a copy of the evidence Leprino needed, United made improper "proprietary and confidential" objections, and falsely told Leprino that Leprino was undermining the FBI investigation by performing its own investigation.

62.     After receiving only a handful of incomplete spreadsheets, Leprino was forced to redo investigative work that United already performed, because United refused to share information.

63.     In October 2022, Leprino's investigation ultimately led it to file a lawsuit in federal court initially against the Surgical Centers, Ms. Zaragoza, Dr. Moeinolmolki, Dr. Kashanchi, Dr.

Kashani, Dr. Aminpour, Dr. Mayer, Dr. Yadegari, Dr. Dermendjian, Dr. Lalezari, Dr. Rosenberg, and Dr. Soliemanzadeh (collectively, the "Surgical Center Defendants").

64.    Leprino continues to pursue this federal lawsuit today, at great expense, as well as a separate lawsuit against Dr. Kashanchi's estate, due to his death in October 2022.

65.    Had United complied with Leprino's requests for documents and information, Leprino's lawsuit could have been filed much earlier; Leprino could have included additional parties in its lawsuit; and the entire suit may have been handled as a whistleblower *qui tam*, or by the U.S. Attorney's Office, at far less expense to Leprino.

66.    In May 2023, in response to Leprino's subpoena from March 2023, United finally produced some documents. United's belated and incomplete production revealed that, from 2021 to 2022, the FBI had encouraged United to separately pursue recovery efforts because federal prosecutors were overwhelmed with unrelated investigations.

67.    In October 2023, after Leprino was forced to file a motion to compel, United finally produced most of its EOBs, investigative files, and provider flagging records. This belated production further revealed the scope of United's failure to act upon or inform Leprino about these fraudulent providers.

68.    In December 2023, nine months after the subpoena was served and twenty-two months since Leprino originally asked for the information, United finally produced a claims sheet that United contends shows all the payments United made to these fraudulent providers. The claims sheet, however, has not been authenticated by United and remains incomplete because it fails to show how United processed the claims at issue.

69.    As of the filing of this Complaint, United, despite numerous legitimate demands from Leprino to do so, has yet to verify the truth, accuracy, and completeness of the records produced, and continues to engage in stall tactics against Leprino's requests for documents and information relating to the fraud by these providers.

**CLAIM ONE**

**Breach of Fiduciary Duty Under ERISA**

**(29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a) and 1109(a))**

70.    Leprino incorporates and realleges all allegations above.

71.    Leprino brings this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a). Leprino has standing to bring this Claim under these provisions as an ERISA fiduciary for the Leprino Plan.

72.    As a named fiduciary and a functional fiduciary of the Leprino Plan, United was an ERISA fiduciary and thus owed the Leprino Plan, Plan Participants, and Leprino a fiduciary duty to discharge its obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

73.    As a named fiduciary and a functional fiduciary of the Leprino Plan, United was an ERISA fiduciary. Thus, United owed the Leprino Plan, Plan Participants, and Leprino a fiduciary duty to manage and administer the Leprino Plan solely in the interest of the plan's participants and beneficiaries. United was required to act with the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the funds. United had a

"negative duty not to misinform" and "an affirmative duty to inform when the trustee knows that silence might be harmful." *Krohn*, 173 F.3d at 548. United also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Leprino Plan's documents. *See* 29 U.S.C. § 1104(a)(1)(D).

74.     As set forth herein, United breached its fiduciary duties by engaging in wrongful acts and practices including, but not limited to, approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Leprino Plan; not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims; misrepresenting the nature of ongoing recovery attempts and law enforcement investigations; withholding crucial documentation related to the losses to which Leprino was entitled; and continuing to pay claims even after they uncovered evidence of fraud.

75.     United's breaches of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Leprino on behalf of the Leprino Plan.

76.     United's communications and behaviors demonstrate that United put its own interests ahead of Leprino, the Leprino Plan, and the Plan Participants.

77.     Accordingly, Leprino seeks (i) the recovery of all losses resulting from United's breach of its fiduciary duty, (ii) the recovery of all benefit or profits United may have made through its breach of its fiduciary duty, (iii) surcharge, (iv) all such other equitable relief as may be appropriate, and (v) the recovery of Leprino's attorneys' fees and costs.

## CLAIM TWO

### Breach of Contract

78.    Leprino incorporates and realleges all allegations above.

79.    This Claim is pleaded in addition and/or in the alternative to the breach of fiduciary duty claims above.

80.    The ASA contractually requires United to perform claims adjudication and related services including recovery and fraud and abuse management.

81.    United breached the ASA by improperly paying claims and then failing to recover overpayments.

82.    United further breached the ASA by refusing to provide Leprino with information it was required to share under the terms of the ASA and by otherwise impeding Leprino's efforts to recover United's overpayments.

83.    As a direct and proximate result of the breaches of the ASA, Leprino has been damaged in an amount to be proved at hearing, as alleged above, and growing.

84.    Accordingly, Leprino seeks (i) the recovery of any and all losses resulting from United's breach of its contractual obligations, (ii) the recovery of any and all benefit or profits United may have made as a result of its breach of its contractual obligations, (iii) surcharge, (iv) all such other equitable relief as may be appropriate, and (v) the recovery of Leprino's attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Leprino respectfully requests that the Court issue a final judgment:

a.      ordering United to pay Leprino and the Leprino Plan for all losses resulting from United breaching its fiduciary duties and/or its contractual obligations;

b.      ordering United to provide to Leprino all claims data for the Surgeons and Surgical Centers related to Plan Participants;

c.      if United contends any of the bills it paid to the Surgeons and Surgical Centers from the Leprino Plan were valid, ordering United to prove the validity of those bills;

d.      ordering United to reimburse the Leprino Plan for all claims United paid to the Surgeons and Surgical Centers;

e.      ordering United to pay interest on all monies that Leprino and the Leprino Plan did not have as a result of United's misconduct;

f.      ordering United to pay costs, attorneys' fees and expenses; and

g.      granting all other relief available, just, proper and permitted under the appliable law and equity as the Court may deem appropriate.

Respectfully submitted this 14th day of March, 2024.

By: */s/ Cliff Stricklin*
        Cliff Stricklin
        KING & SPALDING LLP
        1401 Lawrence Street
        Suite 1900
        Denver, CO 80202
        Tel: (720) 535-2300
        Fax: (720) 535-2400
        Email: cstricklin@kslaw.com

**CERTIFICATE OF SERVICE**

This is to certify that on the 14th day of March, 2024, a true and correct copy of the above and foregoing document has been electronically filed with the foregoing Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel and/or a copy is mailed via U.S. Mail, postage prepaid and properly addressed to those individuals who are non-CM/ECF participants:

By: */s/ Cliff Stricklin*
    Cliff Stricklin
    KING & SPALDING LLP
    1401 Lawrence Street
    Suite 1900
    Denver, CO 80202
    Tel: (720) 535-2300
    Fax: (720) 535-2400
    Email: cstricklin@kslaw.com